THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:



DATED: June 12, 2009

_____
Honorable Pamela Pepper
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

IN RE:     STRECKRICH PETRO CORPORATION,    Case Number 08-31860-pp
          FISCA OIL CO., INC.              (Jointly Administered)

                Debtor-in-possession.        Chapter 11

---

### ORDER AND DECISION GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ASSUMPTION OR REJECTION OF NON-RESIDENTIAL REAL ESTATE LEASE BY ROYALL HOLDINGS, LLC AND ESTATE OF M.R. HUDSON, BY AND THROUGH ITS BENEFICIARY THE M.R. AND EVELYN HUDSON FOUNDATION

---

On February 19, 2009, Royall Holdings, LLC ("Royall") and the Estate of M.R. Hudson ("Estate") (through its beneficiary the M.R. and Evelyn Hudson Foundation) (collectively "Creditors"), filed a Motion to Compel Assumption or Rejection of Non-Residential Real Estate Lease. The parties briefed the issue, and the Court held an evidentiary hearing. Subsequently the parties provided further briefing, and the Court held a second hearing on May 11, 2009. For the reasons that follow, the Court denies the motion insofar as it seeks a finding that the lease has been deemed rejected, and grants the motion in all other respects.

1

# I. FACTUAL BACKGROUND

A. <u>The Stock Purchase Agreement and the Lease Agreement</u>

Fisca Oil Co., Inc. ("Fisca") is a company that operates nine gasoline and convenience stores in Ohio and Missouri, and owns and manages other real estate properties spread across four states. (Affidavit of Owen Richelieu III ("Richelieu Aff.") ¶ 5.) The Estate previously owned 100% of the common shares of Fisca. On or about December 26, 2006, the Estate entered into a Stock Purchase Agreement with Streckrich Petroleum LLC[1] ("Streckrich LLC"), wherein Streckrich LLC agreed to purchase all of the shares of Fisca. (Affidavit of John D. Hooser ("Hooser Aff."), ¶ 3; Exhibit 1 to Creditors' Motion to Compel Assumption or Rejection of Non-Residential Real Estate Lease ("Stock Purchase Agreement").)

Although the parties entered into the Stock Purchase Agreement on December 26, 2006, Streckrich LLC encountered difficulties financing the purchase, and those difficulties required the parties to re-negotiate the agreement. For reasons that the Court does not quite understand, but which are not germane to the topic at hand, the parties agreed that as a part of these re-negotiations, Streckrich LLC would form the Streckrich Petro Corporation ("SPC") prior to closing the Stock Purchase Agreement. They further agreed that under that agreement, SPC would replace Streckrich LLC as the purchaser of the Fisca shares. Owen Richelieu III ("Richelieu") and G. Paul

---

[1] Streckrich Petroleum LLC should not be confused with the debtor-in-possession, Streckrich Petro Corporation. The two entities are separate, as the Court will discuss later in this opinion.

2

Streckmann ("Streckmann") are the principals of both Streckrich LLC and SPC.

After extensive negotiations and several changes to the financing terms of the Stock Purchase Agreement, Streckrich LLC and the Estate executed an Addendum to Stock Purchase Agreement ("Addendum"), wherein they agreed that SPC would replace Streckrich LLC as purchaser under the Agreement. (Exhibit 2 to Creditors' Motion to Compel Assumption or Rejection of Non-Residential Real Estate Lease ("Ex. 2"), at 1.) The Addendum details all of the changes to the original Stock Purchase Agreement. Under the original Agreement, Streckrich LLC had agreed to pay "a nonrefundable earnest money deposit of $100,000," and to pay a total purchase price of $13,500,000.00. (Ex. 2 at 1.) The Addendum decreased the purchase price to $7,000,000.00. The Addendum specified that the payment of that purchase price was to be secured through several different instruments, including a Security Agreement granting the Estate a lien on all of Fisca's shares and assets; a $2,000,000.00 cash payment at closing; and a $4,000,000.00 promissory note (the "$4 million note").[2] (Ex. 2 at 2.) SPC was to pay the final one million dollars of the purchase price by agreeing to Fisca's distribution of a one million dollar dividend to the Estate, prior to Fisca's sale to SPC. (Ex. 2 at 2; Richelieu Aff. at ¶ 10.)

The Addendum further stated that if SPC failed to pay any of the $2 million in cash required at the closing, Fisca would distribute to the Estate, "as sole shareholder

_____

[2] SPC and Fisca entered into the $4 million note for the benefit of the Estate. (Exhibit 4 to Creditors' Motion to Compel Assumption or Rejection of Non-Residential Real Estate Lease ("Ex. 4") at 1.)

3

of [Fisca], a dividend in the amount equal to the difference between the $2,000,000 and the amount of Closing Cash actually paid by [SPC] to [the Estate] by wire transfer as of" noon on the day of closing. (Ex. 2 at ¶1(B).) The Addendum further stated that concurrent with the Addendum, principals Richelieu and Streckmann would execute a $2 million promissory note ("$2 million note") to the benefit of the Estate, to be effective at the time of closing. (Ex. 2 at ¶1(C).) The Estate would "apply to the then outstanding principle on the [$2 million note] (1) the amount of Closing Cash actually paid by [SPC] to [the Estate]; and (2) the amount of any dividend distributed by [Fisca] to [the Estate] to offset Closing Cash owed but not paid" at the time of closing. (Ex. 2 at ¶ 1(C).) The $2 million note was set to mature 30 days after closing, on April 11, 2008. (Exhibit 3 to Creditors' Motion to Compel Assumption or Rejection of Non-Residential Real Estate Lease ("Ex. 3"), at 1.)

In exchange for the lower purchase price, SPC agreed to take less than what it would have received under the original Stock Purchase Agreement. Pursuant to section 2.4 of the Addendum, the parties agreed that prior to its sale, Fisca would make a charitable contribution of four of Fisca's real properties ("Four Properties") to the M.R. and Evelyn Hudson Foundation, rather than selling those properties along with the Fisca stock, as it had planned to do in the original Stock Purchase Agreement. (Ex. 2 at §2.4(A).) The Four Properties consisted of four gas stations and convenience stores, which account for 90% of Fisca's revenues. (Richelieu Aff. ¶ 6.) The Estate agreed to form a new limited liability company, Royall Holdings, LLC ("Royall"), to

4

hold the Four Properties.[3] (Hooser Aff. ¶ 5b.) The Addendum states that SPC executed a Lease Agreement ("Agreement") concurrently with the Addendum, and that Agreement was effective and delivered to the Estate at the time of closing. (Ex. 2 at ¶1(F).) The Stock Purchase closed on March 11, 2008. (Hooser Aff. ¶ 7.) In essence, after the close of the Stock Purchase Agreement, SPC became a holding company whose only asset was 100% of the common stock of Fisca.

Subsequent to these negotiations, Royall and SPC entered into the Agreement.[4] (Exhibit 5 to Creditors' Motion to Compel Assumption or Rejection of Non-Residential Real Estate Lease ("Ex. 5") at 1.) The Agreement allows SPC to use the Four Properties (previously owned by Fisca, but transferred to Royall prior to Fisca's sale to SPC) to operate Fisca's business. (Ex. 5 at 1; Ex. 5 at Ex. A.) In exchange for its use of the Four Properties, SPC agreed to pay rent as listed in the Rent Addendum to the Agreement. (Ex. 5.) The Agreement also states that any default by Richelieu and Streckmann on the $2 million note, or by SPC and Fisca on the $4 million note, will be deemed to be a default under, and a breach of, the Agreement. (Ex. 5, §19.1(h) and (i).)

The $2 million note matured on April 11, 2008, and Richelieu and Streckmann

---

[3] The Estate is the sole member of Royall. (Hooser Aff. ¶ 5b.)

[4] It is unclear when the parties actually entered into the Agreement. The Agreement stated that the "Effective Date" was January 1, 2008. The Agreement is dated March 11, 2007; however, the year appears to be a typographical error and it appears that the parties actually entered into the Agreement on March 11, 2008, the same day that the Stock Purchase closed. (Ex. 5., title page; §2.2.) In any event, the actual date is irrelevant to this analysis, and it is sufficient for our purposes to know that the parties had entered into the Agreement by March 11, 2008.

5

did not pay all of the amounts due under that note. (Hooser Aff. ¶ 10.) On April 21, 2008, the Creditors notified Richelieu and Streckmann of their default under the $2 million note, and notified SPC and Fisca of their default under the $4 million note (by virtue of the cross-default provisions in the $4 million note making the default under the $2 million note a default under the $4 million note). (Hooser Aff. ¶ 10.) The Creditors also notified SPC of its default under the Agreement as a result of the same cross-default provisions. (Hooser Aff. ¶ 10.) SPC also failed to pay the September and October 2008 rents due to Royall under the Agreement. (Hooser Aff. ¶ 12.)

B.     The Bankruptcy Filings of the Debtors-in-Possession

SPC filed Chapter 11 bankruptcy on October 29, 2008, and Fisca filed for Chapter 11 protection on February 12, 2009.  These cases are being jointly administered, but have not been substantively consolidated.  In Schedule G of its bankruptcy filing, SPC characterizes the Agreement as a "Property Lease dated March 11, 2008 on non-residential real property located in Missouri." (Docket No. 10, Schedule G.)  SPC has remained current with its post-petition payments under the Agreement. (Richelieu Aff. ¶ 2.)

C.     The Parties' Positions

The Creditors and SPC both have advanced numerous arguments concerning the Agreement.

1.     *The Creditors' initial arguments*

The Creditors argued that the Bankruptcy Code required SPC to assume or reject the Agreement within 120 days after filing its petition.  The Creditors further

6

argued that if SPC chose to assume the Agreement, the Code required it to cure any arrears due under the Agreement. According to the Creditors, the Agreement required SPC to pay not only all of the amounts due and owing under the Agreement, but also all the amounts due and owing under the $2 million note and the $4 million note, by virtue of the cross-default provisions in the Agreement. By Creditors' calculation, the default under the Agreement was over five million dollars. The Creditors argued that the Code required SPC to pay that entire amount in order to cure the default under the Agreement.

2.    *SPC's initial arguments and Creditors' response*

SPC responded by arguing that the Agreement was not a true lease, and therefore that 11 U.S.C. § 365 did not apply. According to SPC, the Agreement was an integral part of a larger transaction -- the Stock Purchase Agreement. In the alternative, SPC argued that if the Agreement was a lease, the amount the Creditors had requested for cure was disproportionate to the amount actually required to cure the defaults under the Agreement.

During the time that the parties argued the Creditors' motion, the 120th day since SPC filed its petition came and went. In their response to SPC's objection, the Creditors advanced a new argument - that the language of § 365(d) required the Court to deem the lease to have been rejected because SPC had not assumed it within 120 days of the date of filing.

3.    *The evidentiary hearing*

At the evidentiary hearing, John Hooser, the Vice President of the M.R. and

Evelyn Hudson Foundation (which is the sole Beneficiary of the Estate), testified. At the conclusion of the hearing, the Court indicated that it wanted (1) more information from the creditors regarding their assertion that a party could "re-characterize" a lease only by filing an adversary complaint, rather than in response to a motion; (2) more information from all of the parties regarding whether SPC's response to the motion was, in fact, an attempt to re-characterize a lease; (3) more information on the question of whether the Agreement was a lease or a security agreement; (4) more information on whether, if the Agreement was a lease, failure to assume the lease constituted rejection; and (5) if not, argument on acceptable cures. The parties supplied further briefing on these issues.

4. *The additional arguments supplied upon further briefing*

The Creditors argued that SPC was attempting to re-characterize the Agreement, and that it could do so only via an adversary complaint. SPC argued that it was not attempting to re-charcterize a lease as something different, but rather that it was asserting in the first instance that the Agreement was not a lease.

The Creditors argued that the Agreement was a true lease, and that the majority of courts had held that state law controls the issue of whether a document is a true lease. The Creditors noted that the Agreement stated that Missouri law controlled any disputes under the Agreement; therefore, they argued that Missouri law controlled the lease determination issue. The Creditors pointed out numerous provisions in the Agreement that supported their claim that the Agreement was a lease.

8

SPC responded that, if the Agreement "is not a bona fide lease subject to §
365(d)(4), it does not follow that the resulting relationship must be one with the
earmarks of a disguised security agreement." (Docket No. 55 at 6.) SPC argued that
the Agreement "is more appropriately analyzed under the Economic Substance test
requiring consideration of all facts and circumstances." (Docket No. 55 at 7.) SPC
opined that "the facts and circumstances surrounding the Stock Purchase Agreement
[show] . . . that this Lease Agreement is not a bona fide lease . . . but rather is a debt
instrument integrated with the Stock Purchase Agreement and the various Notes and
serves to create . . . a seller-backed loan to allow the transaction to conclude." (Docket
No. 55 at 7.)

    5.    *The Court's decision at oral argument*

The Court heard further argument on May 11, 2009. At that hearing, the Court
orally held that SPC did not need to file an adversary proceeding in order to argue that
the Agreement was not a true lease. The Court further determined that SPC's
argument was not an attempt to "recharacterize" the lease - it simply was a defense to
the Creditor's motion to compel SPC to assume or reject the lease. The Court concluded
that the issue of whether the Agreement constituted a true lease was an issue that
properly was before the Court and was ripe for decision.

It is that issue to which the Court now turns its attention.

## II.    JURISDICTION

The issues in this case involve core proceedings under 28 U.S.C. § 157(b), and
this Court has jurisdiction under 28 U.S.C. § 1334(b).

9

# III. LEGAL ANALYSIS

## A.. The Agreement is a True Lease

### 1. *The Bankruptcy Code requires SPC to assume or reject the Agreement only if the Agreement is a true lease for non-residential real property.*

Because it is SPC who argues that the Agreement is not a true lease, it is SPC who has the burden of proving that proposition. "As the one contending the agreement is something other than what it purports to be, the plaintiff bears the burden of proving that it is a disguised security interest rather than a lease." In re Brankle Brokerage & Leasing, Inc., 394 B.R. 906, 909 (Bankr. N.D.Ind. 2008) (citing In re Pillowtex, Inc., 349 F.3d 711, 717 (3rd Cir.2003); In re QDS Components, Inc., 292 B.R. 313, 321 (Bankr.S.D.Ohio 2002); Auburndale State Bank v. Dairy Farm Leasing Corp., 890 F.2d 888, 893 (7th Cir.1989)).

This issue was joined when the Creditors filed a motion to force SPC to assume or reject the Agreement under 11 U.S.C. § 365. Section 365(a) states that "the trustee, subject to the court's approval, may assume or reject any . . . unexpired lease of the debtor." Subsection (d)(4) of 365 states:

> (4)(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of--
>
> (i) the date that is 120 days after the date of the order for relief;
> . . .
>
> (B)(i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

10

11 U.S.C. §365(d)(4).

SPC, as debtor-in-possession, has the authority to assume or reject a nonresidential lease just as a trustee could under §365(d)(4).  *See*, 11 U.S.C. § 1107(a) (a debtor-in-possession has "all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under" Chapter 11).

Section 365(d)(4) requires SPC to assume or reject the Agreement only if the Agreement is "an unexpired lease of nonresidential real property."  There is no dispute that the Four Properties at issue are gas stations and convenience stores in Missouri, and thus are non-residential real properties.  (Ex. A to Ex. 5.)  To determine whether § 365(d)(4) requires SPC to assume or reject the Agreement, then, the Court must determine whether the Agreement constitutes an "unexpired lease," as the Creditors contend, or whether it is something else.

2.    *State law governs whether the Agreement is a true lease.*

State law controls whether the lease is a "true lease" or a security agreement in the Seventh Circuit.  In United Airlines Inc. v. HSBC Bank USA, N.A., the Seventh Circuit held:

> Because nothing in the Bankruptcy Code says which economic features of a transaction have what consequences, we turn to state law. All of the states have devoted substantial efforts to differentiating leases from secured credit in commercial and banking law. Leases are state-law instruments, after all, and the norm in bankruptcy law is that contracts (of which leases are a species) and property rights in general have the same force they would have in state court, unless the Code overrides the state entitlement.

416 F.3d 609, 615 (7th Cir. 2005) cert. denied, 547 U.S. 1003, 126 S.Ct. 1465, 164

11

L.Ed.2d 247 (2006).

In this case the Agreement states that it is governed by Missouri law. (*See* Ex. 5 at § 23.13.) Therefore, the Court must look to Missouri law to determine whether the lease is a true lease or a security agreement.

      3.    *Missouri law directs the Court to look to the totality of the circumstances to determine whether the Agreement is a lease.*

In <u>Pummill v. McGivern (In re American Eagle Coatings, Inc.)</u>, 353 B.R. 656, 660 (Bankr. W.D.Mo. 2006), the trustee filed an adversary case seeking, among other things, the recovery of "the value of the real property leased by Debtor under the theory that the lease was a disguised financing arrangement." The trustee argued that the federal common law "economic realities test" was the appropriate test to use to determine whether the agreement was a true lease. The court noted, however, that the Seventh Circuit recently had decided <u>United Airlines</u> and had concluded that state law governed the determination of whether an agreement was a true lease unless that state's law is in conflict with the Bankruptcy Code. Thus, the <u>Pummill</u> court looked to Missouri law, and held that in order to determine whether an agreement was a true lease, the court "should look at the totality of the circumstances of the transaction." <u>Id.</u> at 668.

The <u>Pummill</u> court stated that "[i]t has been held that the pivotal factor in determining whether an instrument is a true lease or security agreement is whether or not the lessee has an absolute obligation to purchase the property." <u>Id.</u> (citing <u>In re Hoskins</u>, 266 B.R. 154 (Bankr.W.D.Mo.2001) and cases cited therein.) The court also

12

discussed other factors that a majority of courts had considered when determining whether an agreement is a lease, including:

> whether the lessee has a purchase option at the end and, if so, whether the option price is nominal; whether the aggregate rental payments have a present value equal to or in excess of the original cost of the leased property; and whether the lease term covers the useful life of the property.

Id. at 668 (citing In re Integrated Health Services, Inc., 260 B.R. 71 (Bankr.D.Del.2001). The Pummill decision demonstrates that, under Missouri law, this Court must look to the totality of the circumstances to determine whether the Agreement is a true lease.

    4.    *The totality of the circumstances supports a finding that the Agreement is a true lease.*

The Pummill court held that the "substance of the transaction," and not its form, controlled the determination of whether the transaction constituted a lease. Id. Accordingly, the fact that the parties in this case labeled the Agreement a "lease" is not dispositive of the inquiry. A review of the totality of the circumstances in this case, however, leads the Court to conclude that the Agreement is a true lease, such that it falls under the purview of section 365.

    a.    The Agreement does not include an absolute obligation to purchase any of the Four Properties

As stated in Pummill, "the pivotal factor in determining whether an instrument is a true lease or a security agreement is whether or not the lessee has an absolute obligation to purchase the property." 353 B.R. at 668. In this case, the Agreement does not include an absolute obligation to purchase the property, either during or at

13

the end of the specified term.

Several portions of the Agreement confirm that SPC does not have an absolute obligation to purchase the property, and that SPC may terminate the Agreement without being required to purchase the property.  First, section 17.1 states that "[t]enant shall, on or before the last day of the Term of this Lease or upon the sooner termination thereof, peaceably and quietly surrender and deliver to Landlord the Premises . . . in good order, condition and repair . . . ."  (Ex. 5 at §17.1)  If the Agreement was meant to obligate SPC to purchase the property, then it would not require SPC to "peaceably and quietly surrender and deliver" the premises to Royall on or before the last day of the term of the Agreement.

Second, under section 19.2, upon the occurrence of any event of default (as defined in the Agreement), Royall may terminate the Agreement "and, peaceably or pursuant to appropriate legal proceedings, re-enter, retake and resume possession of the premises for Landlord's own account." (Ex. 5 at § 19.2(a).)  Once Royall gives SPC written notice that the Agreement has been terminated, the "Lease shall cease and expire" and SPC "shall surrender the Premises to the Landlord."  (Ex. 5 at § 19.2(a).) If Royall terminates the Agreement due to an event of default, the Agreement still requires SPC to pay all rent and any other amounts due under the Agreement.  (Ex. 5 at §19.2(a).)

Third, Article XX of the Agreement provides SPC with an option to purchase the property at either (1) the expiration of the term of the Agreement (provided that there has been no default and that the $2 million and $4 million notes have been paid in

14

full); or (2) whenever the $2 million and $4 million notes have been paid in full.  (Ex. 5 at §20.1(a).)  To exercise the option to purchase, SPC must give Royall written notice at least ninety (90) days (1) prior to the expiration of the term or (2) following repayment of both notes.  (Ex. 5 at §20.1(b).)  Article XX does not *require* SPC to purchase the properties; rather, it simply gives SPC the *option* to do so.

Fourth, and similarly, Article XXI states that the Landlord grants the tenant the right of first refusal to purchase the Four Properties "at a price and on terms which shall be the same as offered for the Premises in an 'Offer to Purchase' which is acceptable" to Royall.  To exercise that right, SPC must provide an offer to purchase on the same conditions and price as any offer Royall receives, within 30 days of being given written notice of Royall's receipt of said offer.  (Ex. 5 at Art. XXI.)  Again, Article XXI does not require SPC to purchase the properties; rather, it simply grants SPC the right to submit an identical offer if Royall receives a third-party offer to purchase the properties during the course of the Agreement.  If SPC does not submit an identical offer within 30 days of receiving written notice from Royall, the right of first refusal is void, and Royall is free to accept the third-party offer.

Fifth, section 2.4 states that SPC has the option to renew the lease for an additional five years, and that it can do so up to four times.  The renewal is automatic unless SPC provides Royall with 180 days' written notice, prior to the expiration of the term, of its intent not to renew.  SPC may not exercise the renewal option if (1) it is in default under the Agreement at the time of renewal and (2) it has not cured such default.  (Ex. 5 at §2.4.)  Section 2.4 is clear: "If Tenant shall fail, or shall not be

15

entitled pursuant to the preceding sentence, to extend the Term of this Lease for an additional Option Period, all remaining rights of renewal shall automatically expire." (Ex. 5 at §2.4.) Once the renewal rights expire, the Agreement provides that it concludes at the end of the current term, at which point SPC becomes obligated to peaceably and quietly surrender the premises pursuant to section 19.2.

Sixth, section 11.3 states that if the Four Properties are

damaged or destroyed by any of the casualties described in Section 11.1 to the extent that the Premises are untenantable or unsuitable, in Tenant's reasonable opinion, for continued use in the normal conduct of Tenant's business, Tenant shall have the right, exercisable by written notice to Landlord given within thirty (30) days after the date of such damage or destruction, to terminate this Lease effective upon the date of such damage or destruction.

(Ex. 5 at §11.3.) So, in the event that the premises are damaged or destroyed by casualty, § 11.3 provides that SPC can terminate the Agreement so long as (1) the destruction or damage was insured by SPC for the full replacement cost; (2) the insurer has confirmed that the coverage exists; and, (3) the insurer has confirmed that it is obligated to pay for the damages under the insurance policy. (Ex. 5 at §11.3.) Again - the Agreement does not require SPC to purchase the properties in order to terminate the Agreement.

Similarly, section 12.1 states that, in the event that the "whole Premises or any material part of the building or material portion of the Land" is taken or condemned, or if SPC can demonstrate that the Properties cannot be "profitably operated" as a gas station and convenience store, or if SPC can demonstrate that there is no longer "reasonable access to the adjacent roadways from the existing or comparable curb cuts"

16

as the result of a taking, then SPC may terminate the Agreement. (Ex. 5 at §12.1.) The Agreement does not require SPC to purchase the property if such events occur – it simply permits SPC to terminate the Agreement.

As all of these provisions demonstrate, SPC did not have an absolute obligation, or indeed *any* obligation, to purchase the Four Properties, either during or at the end of the specified term. The Agreement provided SPC with the *option* to purchase, but it made clear that if SPC did not exercise the option, and did not renew the lease term, the premises would revert back to Royall. The absence of an absolute obligation to purchase weighs in favor of the conclusion that the Agreement is a true lease.

> b.    The option price is not nominal.

Another factor the <u>Pummill</u> court considered was "whether the lessee has a purchase option at the end and, if so, whether the option price is nominal." 353 B.R. at 668. As discussed above, the Agreement does contain a purchase option. Under section 20.1 of the Agreement, SPC may purchase the property - either at the end of the term, if no default has occurred and if it has paid the $2 million and the $4 million notes in full, or at any time after the $2 million and $4 million notes have been paid in full.

For SPC to exercise the purchase option, the Agreement requires SPC to pay the greater of (1) five million dollars; or (2)

> [t]he average of appraised value of the Premises as determined by two qualified appraisers, one selected by [Royall] and the other by [SPC], provided that the difference between those two appraisals does not exceed 15%. If the difference. . . exceeds 15%, said appraisers shall select a third appraiser to appraise the value of the Premises, and the Purchase Price

17

shall be the average of all three (3) appraised values.

(Ex. 5 at §20.1(c).)  The Agreement provides that Royall and SPC also may agree to an alternate price if they so choose.

So -- to exercise the purchase option, the Agreement states that SPC must pay the greater of five million dollars or the average of several appraised values.  Neither of these two possible option prices is nominal - a factor which also weighs in favor of the conclusion that the Agreement is a true lease.

        c.      The term of the Agreement does not cover the useful life of the property.

Another factor to consider when looking at the totality of the circumstances is "whether the lease term covers the useful life of the property."  <u>Pummill</u>, 353 B.R. at 668.  In the present case, the "property" consists of gas stations and convenience stores. The term of the Agreement is twenty years, with the option of extending the term for a maximum of twenty years.  Although there was no testimony as to the age of any of the gas stations, it does not appear likely that the 20-year term covers the useful life of such property.  The properties at issue are buildings that will continue to be useful long after the term of the Agreement has ended, even assuming that the Agreement is extended four times.  Again, this fact weighs in favor of a conclusion that the Agreement is a true lease.

18

d.   The remaining facts support a finding that the Agreement is a true lease.

i.   <u>The parties appear to have intended the Agreement to be a lease agreement</u>.

As noted in <u>Pummill</u>, "Missouri cases look at the intent of the parties which can be determined from a consideration of the entire instrument, and the circumstances under which it was made."   <u>Id.</u>   SPC argues that the primary purpose of the Agreement

was not to find a tenant for the Income Producing Properties but to create a device to transfer cash to the Estate in exchange for the Fisca stock . . . When $4.5 million of cash was not available from [third party financier] Servant to pay to the Estate to conclude the stock purchase, the Estate created substitute financing to accomplish the same result. The economic substance of the Lease Agreement was at all times to create a loan to allow the Estate to conclude the Stock Purchase.

(Docket No. 55 at 4-5.)  SPC further argues that

The Estate's representatives knew that the Income Producing Stores were going to be operated, possessed and controlled by Fisca, knew that any arrangement with Streckrich in relation to the Income Producing Stores was solely for the use and benefit of Fisca and knew that payments could only be satisfied from and by Fisca.  As a result, the facts and circumstances surrounding the Stock Purchase Agreement requires [sic] a determination that this Lease Agreement is not a bona fide lease subject to the requirements of §365(d)(4) but rather is a debt instrument integrated with the Stock Purchase Agreement and the various Notes and serves to create and identify a seller-backed loan to allow the transaction to conclude.

(Docket No. 55 at 7.)

Although SPC argues that the parties intended that the Agreement be a "debt instrument" to allow the Stock Purchase Agreement to conclude, other circumstances in the case, and various provisions in the Agreement, contradict this assertion.   If SPC

19

truly believed that the Agreement was a loan agreement, one would expect that it would list Royall on Schedule D as a creditor holding a secured claim. It did not do so. Rather, it listed the Agreement on Schedule G as a "Property Lease dated March 11, 2008 on non-residential real property located in Missouri." (Docket No. 10, Schedule G.) Schedule G requires a debtor to describe all "unexpired leases of real or personal property." SPC *itself*, therefore, characterized the Agreement as a lease agreement as late as November 13, 2008 when it filed its bankruptcy schedules.[5]

In addition, the Agreement states that the parties "agree and acknowledge that this transaction is not intended as a security arrangement or financing secured by real property, but shall be construed for all purposes as a true lease." (Ex. 5 at § 23.18.) While the form of the agreement does not control, this section specifically states that the parties intended for the Agreement to be a lease agreement and not a financing or security agreement. This, and the fact that SPC characterized the Agreement as a lease as late as November 13, 2008, provides persuasive support for the conclusion that the parties intended the Agreement to be a lease.

        ii.    <u>Many other provisions in the Agreement demonstrate that it is a lease agreement.</u>

The Agreement contains a number of other provisions that are similar to true lease provisions, including provisions permitting Royall the right to enter the

---

[5] In addition, in its motion for an order extending the exclusivity period for filing a plan of reorganization and to solicit acceptances thereof, SPC stated that it was a holding company with an interest in a "Lease Agreement," and that it was the tenant and Royall was the Landlord in that lease agreement. (Docket No. 26 at 2.)

20

properties upon reasonable notice to inspect the properties (Ex. 5 at Art. XIII); provisions prohibiting SPC from subletting the properties or assigning its rights under the Agreement without Royall's prior written approval (Ex. 5 at Art. XIV); and provisions requiring SPC to obtain prior written consent from Royall before making any "additions, alteration or removals to the Premises which [SPC] believes reasonably beneficial to Tenant's business" that are in excess of $75,000 and giving Royall "the right to inspect any such work at all times during normal working hours." (Ex. 5 at § 9.2).

In addition, while the Agreement requires SPC to pay the costs of any maintenance or repairs, the Agreement states that "the costs of any repair having a Useful Life . . . which exceeds the Term of this Lease, including presumed properly executed Option Periods, shall be prorated between Landlord and Tenant in the same proportion as the remaining Term of the Lease bears to the Useful Life of the repair." (Ex. 5 at §10.1.) Similarly, while the Agreement requires SPC to pay the costs of all required insurance policies, the Agreement also requires that all of the policies "incorporate an endorsement in favor of [Royall] and any mortgage," and must name Royall and its designated mortgagee as the additional insured. (Ex. 5 at §8.2). In the event that the premises are damaged or destroyed such that the premises are rendered untenantable and SPC terminates the Agreement pursuant to section 11.3, Royall is entitled to all of the insurance proceeds on the Four Properties. (Ex. 5 at § 11.3.) If SPC terminates the Agreement under section 12.1 because of a substantial taking or a taking that renders SPC unable to profitably operate its business, Royall, as the

21

owner, is entitled to the entire award for the taking. (Ex. 5 at § 12.3.) If SPC elects not to terminate the Agreement because of a taking, SPC is only "entitled to the award to the extent required for restoration of the Premises, and Landlord shall be entitled to the balance of the award not applied to restoration." (Ex. 5 at § 12.3.)

The Agreement further requires that "not later than (i) thirty (30) days prior to the expiration of the Lease or (ii) ninety days after termination of the tenancy, whichever may apply" SPC must provide Royall with certain hazardous material records and environmental records. (Ex. 5 at § 4.7.) While the Agreement requires SPC to pay all of the real estate taxes on the property, it also requires SPC to provide Royall with a copy of the paid tax bills, and it gives both SPC and Royall the ability to contest the validity or amount of any real estate tax assessments. (Ex. 5 at §5.1.) The Agreement also states that SPC's interest in the Agreement is subordinate to any mortgages, and that it agrees to attorn to any successor of interest in Royall under the Agreement for the balance of the term of the Agreement. (Ex. 5 at § 16.1-16.2.)

All of these provisions underscore the fact that Royall continued to " 'retain all risk and benefits as to the value of the real estate at the termination of the lease.' " United Airlines, Inc. 416 F.3d at 614 (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978)).

       iii.   Even if the aggregate rental payments have a present value equal to the original cost of the Four Properties, this fact alone does not outweigh the numerous factors discussed above.

One of the other factors discussed in Pummill is "whether the aggregate rental

payments have a present value equal to or in excess of the original cost of the leased property." 353 B.R. at 668. The parties did not present any evidence as to the original cost of the Four Properties, other than the affidavit of Owen Richelieu. That affidavit states that the Four Properties were valued at "$8.5 million at the time of the 2007 Stock Purchase Agreement." (Richelieu Aff. ¶ 18.) SPC claims that the Agreement "required a stream of payments over 20 years that totaled almost $13,000,000 for property that was initially to be acquired for approximately $9,000,000." (Docket No. 55 at 5.) Assuming without deciding that the aggregate rental payments do have a present value in excess of the original cost of the leased property, this factor alone does not suffice to outweigh the factors discussed above.

> iv. The Court disagrees with SPC's characterization of the Agreement.

In spite of all of the facts discussed above, SPC argues that the Agreement is not a lease, but actually is just part of the Stock Purchase Agreement and the Addendum. SPC asserts that

> [The Agreement] on its face states that it is part of the stock purchase. Including terms which provide for an option to purchase under specified circumstances (Article XX), required a stream of payments over 20 years that totaled almost $13,000,000 for property that was initially to be acquired for approximately $9,000,000, prohibited assignment (Article XIV), limited the use of the stores to gas and convenience store uses (Article IV), provided a right of first refusal to the Debtors (Article XXI) and contains cross-default language to the $2 Million Note and the $4 Million Note are all terms which insure that the Income Producing Stores remain a part of the purchase package until the stock price is paid in full.

(Docket No. 55 at 5.)

The Court disagrees with SPC's characterization of these provisions of the

23

Agreement. The fact that the Agreement limits the use of the Four Properties weighs *in favor* of the conclusion that it is a lease, because the owner of the property retains every right to restrict the use of the property by a tenant. Similarly, the owner of property has the right to restrict a tenant's ability to assign its rights under a lease, because the owner wants to be assured of its ability to select the entity with whom it is doing business. The fact that the Agreement provides both an option to purchase and a right of first refusal demonstrates, not that it is not a lease, but only the economic reality of this transaction. SPC could not afford to purchase the properties and the Fisca stock for $13.5 million, so the Creditors leased the Four Properties to SPC to allow it more time to come up with the money to purchase the properties. The option to purchase and the right of first refusal simply guaranteed that SPC would have the right to purchase the property at some point, once it had paid for the Fisca stock. The cross-default provisions in the Agreement confirm this opportunity - SPC had to pay for the Fisca stock at the same time that it leased the property. Rather than refusing to go forward with the deal because SPC could not raise all of the purchase price at the outset, Royall allowed SPC to purchase only the stock, and allowed SPC to lease the Four Properties while it attempted to secure additional funds to purchase them. Because it was possible that SPC never would be able to secure additional funds to purchase the properties, the Agreement insured that Creditors would be compensated for SPC's use of the properties through regular lease payments.

Considering all of the provisions of the Agreement as a whole, and considering how SPC itself characterized the Agreement prior to the filing of the instant motion,

24

the Court concludes that the Agreement is a true lease.

B.   <u>SPC Must Assume or Reject the Lease Within Seven (7) Days of the Date of this</u>
     <u>Order</u>

Having determined that the Agreement is a true lease, the Court next must
determine whether it must deem SPC to have rejected the lease.  Section 365(d)(4)
requires a trustee or debtor-in-possession to assume or reject a non-residential real
estate lease within 120 days of the petition date.  11 U.S.C. § 365(d)(4)(A).  SPC filed
its petition on October 29, 2008, and the Creditors filed their motion to compel
assumption or rejection of the lease on February 19, 2009 -- 113 days later.  The
Creditors gave SPC until March 9, 2009 to object to their motion.  On February 26,
2009, the last day of the 120 day period for SPC to assume or reject the lease, SPC filed
a motion asking the Court to extend the exclusivity period in SPC (Streckrich Petro
Corporation, Case Number 08-31860) to track the exclusivity period in Fisca's case
(Fisca Oil Co., Inc., Case Number 09-21519).  (Docket No. 26.)

SPC argues that it did not file a motion to extend the time to assume or reject
the Agreement because it had filed instead the motion asking the Court to extend the
exclusivity period in SPC's case to track the exclusivity period in Fisca's case.  This
argument implies that SPC believes that by filing the motion to extend the exclusivity
period, it somehow also requested an extension of the time to assume or reject the
Agreement.  SPC filed a Motion to Extend the Exclusivity Period for Filing a Chapter
11 Plan and Disclosure Statement and to Solicit Acceptances Thereof.  (Docket No. 26.)
The Court notes that in that motion, SPC asked only for the same exclusivity periods

25

in Fisca and SPC.  SPC did not ask the Court to conform all of the applicable deadlines in both cases, only the exclusivity period deadline.  At this point, therefore, SPC has not requested an extension of time within which to assume or reject the lease.

In In re Ted Liu's Szechuan Garden, Inc., 55 B.R. 8, 9 (Bankr. D.D.C. 1985), the Chapter 11 debtor's landlord filed a motion for relief from the automatic stay so that the landlord could continue state court eviction proceedings that had been stayed when the debtor filed bankruptcy.  At the hearing on the motion, the court considered whether the lease had been terminated prior to bankruptcy.  The debtor had not yet assumed or rejected the non-residential real estate lease under section 365(d)(4).  The court considered a prior version of section 365(d)(4), which provided the debtor with 60 days, rather than 120 days, to assume or reject the lease.  The court held:

> in this case the 60-day period [for assuming or rejecting the lease] had not yet run when this Court took under advisement the question of whether or not there was an unexpired lease which could be assumed; only 36 days had elapsed.  At all times it has been apparent to both Landlord and Debtor . . . that the Debtor desired to exercise both the right to redeem and the right to assume the lease.  But the right to assume could not be exercised until the right to redeem was established; establishment of the right to redeem was thus a precondition before the right to assume could be exercised.  The right to redeem has now been established by this Opinion.  Thus, the running of the 60-day period for exercising the right to assume (or obtaining an extension of time to exercise that right) should be tolled during the time that the matter of the right to redeem has remained under advisement by this Court. . . . *See generally* 51 Am.Jur.2d Limitation of Actions § 140 (1970) . . . .

Id. at 11.

The Ted Liu's Szechuan Garden, Inc. court exercised "its powers as a court of equity" and held that the 60-day period was tolled during the time that it considered

26

the question of whether there was a lease that could be assumed in the bankruptcy action. Id. The court noted that its "analogy is not perfect. . . . this Court's taking the question of the right to redeem under advisement did not positively *prevent* the Debtor from seeking an extension of time within which to assume or reject. Nevertheless, the Debtor may well have been lulled into inaction by what the Court did." Id. at n.5.

In this case, the Creditors filed a motion to compel SPC to assume or reject the lease. The Creditors gave SPC a period of time to object to that motion, and SPC did file an objection on March 9, 2009. In that objection, SPC argued that the Agreement was not a true lease and thus that it did not have to assume or reject it under § 365. The Creditors responded to this objection by saying "gotcha" -- they argued that the time for assuming or rejecting the lease had expired while SPC was formulating its objection. (Docket No. 40 at 2.)

The Creditors asked the Court to *determine* whether § 365 compelled SPC to assume or reject the lease. The Court holds that once the Creditors filed their motion, they effectively asked the Court to take the matter under advisement and issue a ruling as to whether § 365 required SPC to assume or reject the lease. Once the Court took the question under advisement, SPC was most likely lulled into inaction on the issue of whether to assume or reject the lease by the fact that it had the opportunity to *respond* to the motion to compel assumption or rejection. The Court holds, therefore, pursuant to its equitable powers, that the Creditors' motion to compel assumption or rejection of the lease tolled the time for assuming or rejecting the lease.

At the time the Creditors filed their motion, 113 days had elapsed since SPC

Case 08-31860-pp    Doc 67    Filed 06/12/09    Page 27 of 28

filed the petition.  Therefore SPC has seven (7) days from the date of this order to assume or reject the lease or to request an extension of that time under section 365.

### III.  CONCLUSION

For the reasons discussed above, the Court hereby **DENIES** the Creditors' motion to compel insofar as it seeks a finding that the lease has been deemed rejected, and **GRANTS** the motion in all other respects.  SPC has seven (7) days from the date of this order to assume or reject the lease, or to request an extension of the time to assume or reject the lease. In the event that SPC does assume the lease, the Court will schedule a further evidentiary hearing to determine the appropriate amount of cure that must be provided.

# # # # #

Case 08-31860-pp   Doc 67   Filed 06/12/09   Page 28 of 28